AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the
### District of New Mexico

**FILED**
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )     Case No.  MR 21-205 KK
)
120 INDIANA STREET SE, TRAILER #4, )
ALBUQUERQUE, NEW MEXICO 87108. )
)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A (incorporated by reference).

located in the _____ District of _____New Mexico_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distributing and possessing with intent to distribute a controlled substance |
| 21 U.S.C. § 846 | Conspiracy to distribute and possess with intent to distribute a controlled substance |

The application is based on these facts:
See the attached affidavit of DEA Task Force Officer Erick Castañeda, which is incorporated by reference and has been reviewed and approved by AUSA Lou Mattei.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Erick Castañeda, DEA Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_telephonically sworn and electronically submitted_ *(specify reliable electronic means).*

Date: __February 12, 2021__

_____
*Judge's signature*

City and state: __Albuquerque, New Mexico__

Honorable Kirtan Khalsa, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>120 INDIANA STREET SE, TRAILER #4,<br>ALBUQUERQUE, NEW MEXICO 87108. | Case No. _____ |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Erick D. Castañeda, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 120 Indiana Street SE, Trailer #4, Albuquerque, New Mexico 87108, hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B.

2.      I am a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA) and have been since June 2020.  As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request arrest and search warrants.  Furthermore, I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations and to make arrests for criminal offenses, to include those enumerated in 18 U.S.C. § 2516.  Prior to being a TFO with the DEA, I worked as a full-time sworn law enforcement officer with the Bernalillo County Sheriff's Office (BCSO) since June 2015.

3.     In my time as a DEA TFO and BCSO Deputy, I have received training on surveillance and counter-surveillance operations, undercover operations, confidential source operations, criminal law, and investigations involving federal electronic surveillance statutes, drug identification, and search warrant executions.  I have also spoken with other law enforcement officers with expertise and experience in these areas.

4.     My experience as a DEA TFO and BCSO Deputy includes, but is not limited to, conducting surveillance, interviewing witnesses, writing affidavits for and executing search and seizure warrants, debriefing defendants and confidential sources, and working with undercover agents and informants.  I have received training and have experience in the investigation of violations of the federal drug and money laundering laws, including the offenses listed below. As a result, I am familiar with matters including, but not limited to, the means and methods used by drug traffickers and drug trafficking organizations to purchase, transport, store, and distribute illegal drugs and to hide profits generated from those transactions.  I also have experience in analyzing and interpreting drug codes and cryptic dialogues used by drug traffickers.

5.     I have been involved in an ongoing investigation regarding the distribution of controlled substances, specifically fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propenamide), by Aiyana LUERAS.  Since the investigation's inception, I, as well as other Special Agents and Task Force Officers with the DEA, and law enforcement officials from other agencies have obtained information regarding the illegal drug trafficking activities of LUERAS.

6.     I make this affidavit based upon my own personal knowledge, which is

2

substantially derived from my participation in the investigation, as well as that of fellow agents and officers who have participated in the investigation. In addition, I have developed information I believe to be reliable from additional sources including:

    a.    Information provided by Task Force Officers ("TFO"), Special Agents ("SA"), and Intelligence Research Specialists (IRS) of the DEA, and other law enforcement officials ("agents"), including oral and written reports that I have received directly or indirectly from said investigators;

    b.    Results of physical surveillance conducted by agents during the investigation;

    c.    Information derived from consensually recorded conversations;

    d.    A review of driver's license and automobile registration records;

    e.    Records from commercial databases; and

    f.    Records from the National Crime Information Center ("NCIC").

7.    This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

8.    I believe there is probable cause that LUERAS has committed offenses involving violations of, *inter alia*:

    a.    21 U.S.C. § 841 – Distribution and possession with intent to distribute controlled substances; and

3

b.    21 U.S.C. § 846 – Conspiracy to distribute and possess with intent to distribute controlled substances.

## EVIDENCE SOUGHT DURING SEARCH

9.    Based on my training, experience and participation in this and in similar investigations, I believe that individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings.  They also conceal evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses.  Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property.  This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging and distributing controlled substances, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

10.    Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

11.    Individuals involved in drug dealing commonly use certain paraphernalia to

4

package and prepare controlled substances for distribution.  The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances.  Drug dealers commonly store these items on their person, in their residences, in their businesses, in their residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

12.    Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses.  Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators.  These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

13.    Drug traffickers often travel domestically and internationally to facilitate their trafficking.  Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas.  These items are stored by drug dealers on their person or in their business, residences and surrounding

garages, outbuildings, carports and yards, the residences of relatives and in cars. Many of these items are accessible via the internet and can be downloaded and saved on the computer or other digital media and on storage media.

14.    Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses. These off-site storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide drugs, contraband, money and other valuables. Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities. Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes. This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

15.    Other evidence of transportation, ordering, possession and sale of drugs can include the following: telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns. The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the

residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

16.    Drug traffickers usually sell their product for cash. Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory. In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

17.    Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs. To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious. They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

18.    Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment

7

account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media. The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

19.     The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above-devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these

communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

20.     Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs.  They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives.  Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Drug traffickers frequently use these devices to take their photographs and videos.

21.     Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves and their drugs and their drug profits.  They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

22.     I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

23.     Drug traffickers often conceal evidence of drug dealing in vehicles outside of

9

their residences for ready access and to prevent detection and seizure by officers executing

search warrants at their residences.  This evidence, which is discussed in detail in the preceding

paragraphs, includes controlled substances, indicia such as packing documents and electronic

storage devices (and their contents,) evidence tending to show the distribution of drugs (such as

IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.),

digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and

counter-surveillance devices.

24.     Drug traffickers often utilize digital video surveillance systems. A digital video

surveillance system is a surveillance system that is capable of capturing images, videos, and

audio that can be compressed, stored or sent over communication networks. I know that it is

common for digital surveillance systems to contain storage media that allow for 30 days or more

of camera footage to be stored on the system. Digital video surveillance systems can be used for

nearly any environment, including a commercial business or residence. I know that drug

traffickers make use of video surveillance systems to monitor who is approaching their residence

and assess whether the person presents a threat to the trafficker's drugs or drug proceeds. Drug

traffickers also utilize surveillance equipment to obtain advance notice when law enforcement

arrives to hide or destroy evidence of criminal activity. However, given the constant recording

that occurs with a digital surveillance system, it is also common that the digital video

surveillance system will also depict evidence of the residents' drug trafficking activities and

conversations related to drug trafficking.

25.    Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized.  Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts.  These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

26.    The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.  The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

27.    A list of items agents seek authority to seize is in Attachment B.

**COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

28.    As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the PREMISES, in whatever form they

11

are found. Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on computers, digital media and other storage media. For this reason, I submit that if a computer, digital medium, or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

29.   *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

   a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises

12

could be unreasonable. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

30.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying computers and/or storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited

13

to computer-assisted scans of the computer or entire medium, that might expose many parts of a

hard drive to human inspection in order to determine whether it is evidence described by the

warrant.

## **PROBABLE CAUSE**

31.    In November 2020, the DEA identified Aiyana LUERAS as a source of supply

(SOS) for fentanyl pills for a target the DEA was investigating.  In the following months, agents

and TFOs conducted further investigation of LUERAS' movements, locations, and drug-

trafficking habits that is not recounted here.

32.    In February 2021, agents observed LUERAS driving a white Chrysler 300 bearing

New Mexico temporary tag 21T035137.  Subsequent surveillance revealed LUERAS' white

Chrysler 300 was parked in front of the PREMISES during both day and nighttime hours.  On

February 11, 2021, I observed LUERAS exit the PREMISES and meet with a silver SUV near

the entrance to the trailer park.  I positively identified LUERAS at that time.

33.    On February 12, 2021, DEA Special Agent (SA) Jared Queen, acting in an

undercover (UC) capacity, contacted LUERAS and arranged to purchase an amount of fentanyl

pills from her.  LUERAS advised the UC to meet her in the southeast part of Albuquerque.

During this time, agents were conducting surveillance of the PREMISES and observed a white

Chrysler 300 parked in front of the PREMISES. Agents then observed a female, subsequently

identified as LUERAS, exit the trailer park driving a red Chrysler 300. Agents followed that car to the predetermined location where LUERAS advised the UC to meet her.

34.     The UC then arrived at the location and met with LUERAS inside LUERAS' car. LUERAS and the UC were the only occupants of the car. The UC gave LUERAS approximately $1,200. In exchange, LUERAS gave the UC approximately 200 fentanyl pills.

35.     After the fentanyl pills were purchased, the UC left LUERAS' car and gave a predetermined signal to other nearby agents, who moved in to arrest LUERAS. During the arrest, I observed a tan FNH 509 9mm handgun on top of the driver's seat of LUERAS' car, where LUERAS had been sitting during the UC transaction. LUERAS was the only occupant of the vehicle at the time of her arrest.

36.     SA Queen transported the suspected fentanyl pills to the DEA office in Albuquerque where it was field tested. The pills showed a presumptive positive for the presence of fentanyl.

37.     Agents read LUERAS her rights per *Miranda* which she stated she understood and agreed to speak to agents. LUERAS stated she had approximately 600 fentanyl pills inside her vehicle. She also advised she had approximately 4,000 fentanyl pills back at her residence (the PREMISES). LUERAS stated she payed rent for the PREMISES and stated she had documents proving she was renting the trailer.

38.    During a search of LUERAS' red Chrysler 300 following her arrest, agents seized the a tan FNH 509 9mm handgun and approximately 210 gross grams of suspected fentanyl pills from inside the vehicle.

39.    LUERAS also gave verbal and written consent allowing agents to search her residence, but we are seeking this warrant out of an abundance of caution.  LUERAS advised her boyfriend and 3-year-old son were inside the residence.

40.    Based on the information above, I believe there is probable cause that evidence of LUERAS' fentanyl trafficking will be located in the PREMISES.

## CONCLUSION

41.    I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

42.    AUSA Lou Mattei reviewed this affidavit.

Respectfully submitted,

Erick D. Castañeda
Task Force Officer
Drug Enforcement Administration

16

Electronically signed and telephonically sworn
on February 12, 2021:

HON. KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE

17

## ATTACHMENT A

*Property to be searched*

The property to be searched is 120 INDIANA STREET SE, TRAILER #4,

ALBUQUERQUE, NEW MEXICO 87108 (the "PREMISES"), further described as brown

single-wide trailer with white trim.  Near the front door of the trailer, the number "4" is affixed

to the exterior wall.  A photograph of the PREMISES is included below:



The search of the above PREMISES shall include the search of the entire residence, all

attached and unattached garages and storage areas/containers (including mailboxes and trash

cans) on the PREMISES, and all persons located in the PREMISES in or on which the items to

be seized could be concealed.  The search shall also include all vehicles parked at, or in front of,

the PREMISES that have an apparent connection to the PREMISES and/or the residents of the PREMISES. Connection to the vehicle may be established by evidence that anyone residing at the PREMISES own, operate, and/or have access to any vehicle parked at or in front of the PREMISES. Evidence includes prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

2

## ATTACHMENT B

*Property to be seized*

All records, information, and evidence relating to violations of 21 U.S.C. §§ 841(a)(1) and 846, those violations involving Aiyana LUERAS, including:

1. Controlled substances, including fentanyl, methamphetamine, heroin, cocaine, and marijuana.

2. Drug paraphernalia, including scales, packaging materials, items for packaging and handling drugs.

3. Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions.

4. Any and all drug customer lists, drug records, dealers lists, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or dealers, and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

5. Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

6. Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their drug trafficking associates.

7. Messages, notes, correspondence, and/or communications between drug trafficking associates.

8. Indications of ownership or control of said premises and/or other premises used in unlawful drug trafficking activity, including utility bills, cancelled checks, or envelopes and deeds or leases.

9. Indications of ownership or control over any vehicles located at the place to be searched, including titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

10. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

11. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

12. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed.

13. Photographs or videos of the drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

14. Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

15. Firearms and ammunition, including handguns, rifles, shotguns and automatic weapons.

16. Digital video surveillance systems, including the associated storage media.

17. Any and all computers, digital media, and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B.

2

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.